**UNITED STATES of America**

v.

**UNITED STATES CURRENCY TOTALLING $92,000.00.**

**Civ. No. 1: 87–CV–987–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 9, 1989.

Albert L. Kemp, Jr., Asst. U.S. Atty., Atlanta, Ga., for plaintiff.

John L. Dolan, Jr., Edward Witt Chandler, Memphis, Tenn., J. Dunhan McAllister, Jonesboro, Ga., for defendant.

### ORDER

ORINDA D. EVANS, District Judge.

The Government seeks the forfeiture of $92,000.00 in United States Currency, pursuant to 21 U.S.C. § 881(a)(6). The case was tried without a jury on March 7, 1989. The court makes the following findings of fact and conclusions of law.

On October 21, 1986 at Atlanta's Hartsfield Airport the government seized the money at issue from Claimant Lamar Cochran while he was travelling from Memphis, Tennessee to Miami, Florida via Atlanta. The money was in a briefcase within Mr. Cochran's luggage. Mr. Cochran's travelling companion, Kaster Dale Tipton, has asserted no claim to the money. The other Claimant, Clyde Taylor, was Mr. Cochran's employer in October, 1986.

21 U.S.C. § 881(a) allows the government to seek forfeiture of drug related funds. That section states in pertinent part:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . . .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter....

The government claims that Mr. Cochran and Mr. Tipton were travelling to Miami in order to exchange the $92,000 for a controlled substance.

Around mid-morning, October 21, 1986, a Delta Air Lines employee at Hartsfield Airport told DEA agent Robert E. Johnson that two individuals on Delta's flight from Atlanta to Miami, Robert and James Jones, had simultaneously purchased one-way tickets to Miami in cash at 8:16 A.M. that morning in Memphis. The Delta employee identified the two individuals to Agent Johnson as they deplaned from the incoming Memphis flight.

Agent Johnson related this information to DEA Agent Paul Markonni. They decided to observe the two Joneses, one of whom was attired in dress slacks and a sport coat; the other was in bib overalls and a denim jacket. The agents followed them as they walked together to their departure gate. After several minutes at the gate, the man in the sport coat left the departure gate area to browse at a gift shop within the Delta concourse. Agent Markonni followed him, then approached him and told him he was a police officer. He displayed his credentials reflecting that he is a deputized Clayton County police officer. Markonni then asked the man if he would mind speaking with him. The individual said he would not mind.

Agent Markonni then asked if he could look at his plane ticket. The individual said he could; he showed him the ticket issued in the name of Robert Jones. Agent Markonni returned the valid portion of the ticket and kept the carbon copy. Agent Markonni then asked if he had some identification. The individual then said his real name was Lamar Cochran. Mr. Cochran said that someone else had made the reservation for him under the name of Jones.

At this point, Mr. Cochran acted very nervous. Agent Markonni asked him if he were travelling with anyone else and Cochran replied he was not. Agent Markonni followed up by asking if he were travelling alone, and Cochran then answered yes.

Agent Markonni placed Mr. Cochran under arrest for violation of O.C.G.A. § 16–10–25 (giving a false name to a police officer), read him his *Miranda* rights and patted him down. The patdown yielded an envelope in Mr. Cochran's sock top containing four marijuana "joints" weighing under one gram. Agent Markonni then took Mr. Cochran to a nearby office. Mr. Cochran sat in the office with his hands handcuffed behind his back.

While this was transpiring, a similar scene took place between Agent Johnson and the overalled individual who had remained at the departure gate. Agent Johnson approached and identified himself as a police officer. He asked the individual if he would mind speaking with him; the overalled man said he would not mind. Johnson asked the individual if he could see his plane ticket. The plane ticket was provided. After noting that it bore the name "James Jones," Johnson asked him his name and was told he was James Jones. At that point, Johnson asked if Mr. "Jones" had any identification; "Jones" responded he did not have any. He further stated he had no wallet.

Agent Johnson indicated he was a narcotics agent. At that point, the overalled individual opened his carry-on bag and invited Johnson to look in it, claiming it contained no drugs. Johnson did look and found no drugs.

Johnson again asked the individual his name; at this point he said, "Dale Tipton." Agent Johnson told Tipton to remain at the gate. He left him under the surveillance of another DEA agent. After conferring with Agent Markonni, Johnson returned to the gate and arrested Tipton. He read Tipton his rights and took him to the office where Cochran was seated, handcuffed.

Within a few minutes, Delta personnel brought Cochran's and Tipton's luggage which had been checked through to Miami prior to their departure from Memphis. Agent Markonni advised Cochran and Tip-

ton of their right to refuse to consent to search of the luggage and the implications of consent. Both individuals stated they had no objection to their luggage being searched.

When Agent Markonni opened the luggage identified as Cochran's, he found inside it a brown briefcase with a combination lock. Cochran initially stated he did not know the combination; he then suggested a couple of possibilities, neither of which worked. Agent Markonni then dialed "000"; the lock opened. Markonni then again asked Cochran if it was all right to look inside the briefcase. Cochran said yes. The opened briefcase revealed a large quantity of cash, which turned out to be $92,000.

At that point, Cochran stated he had not known any money was in the bag; he was surprised to see the cash. In response to Markonni's question Cochran stated he was going to Miami to pick up a used car, but he had no information about who he would get the car from or any of the details of the purchase. He stated he was supposed to be contacted once he got to Miami and had checked into the Omni Hotel there.

Shortly thereafter, Agent Johnson called the Memphis Drug Task Force and spoke with Officer Gail Hewitt. She advised that Tipton was a well known drug dealer in Memphis, but she had no information concerning Cochran.

At about 1:00 p.m., a narcotics dog, "Ranger," was brought to the airport by his handler, Gwinnett County Sergeant William Galloway. Ranger has been trained to alert to the presence of cocaine, heroin, marijuana, hashish, and methaqualone. Ranger was allowed to sniff at five similar sized large envelopes, one of which contained the $92,000 and four of which contained government issue paper towels. The envelopes were placed on the floor a few feet apart. Ranger alerted only to the envelope containing the currency.

Subsequent to these events, both Tipton and Cochran pled guilty in the Superior Court of Clayton County to giving a false name to a police officer; Cochran also pled guilty to possession of less than an ounce of marijuana. Also, the evidence at trial reflected that on December 17, 1985, Cochran pled guilty to possession of marijuana; on June 3, 1987, he was convicted of trafficking in marijuana in Florida. He is presently serving a three year sentence.

On May 15, 1987, the government initiated the instant forfeiture proceeding. Cochran and Tipton were notified of their right to make a claim to the $92,000. Tipton asserted no claim; Cochran filed a claim stating the money belonged to Clyde Taylor. In addition, Clyde Taylor filed a claim. Mr. Taylor had been identified by Cochran as the person for whom Cochran was working at the time of the airport arrest.

Tipton did not appear as a witness at trial. Cochran appeared only by deposition. The only two witnesses who testified for the Claimants were Clyde Taylor and Robert Houston. The Claimants presented no documentary evidence, except for one photograph of a Rolls Royce. The bulk of Claimants' evidence was the testimony of Mr. Taylor, who asserts that the $92,000 belongs to him. He asserts that of the $92,000, between $24,000 to $28,000 was the proceeds of a loan from Robert Houston, and $55,000 was the proceeds of a loan from Terrence Miller. Houston testified that he had in fact loaned Taylor money, but he testified that the amount was $20,-000. Neither the testimony of Taylor nor Houston indicated what the terms of these loans were. No documentation was presented with respect to the alleged car transaction or the loans.

Mr. Taylor's testimony was basically to this effect. He testified that in the past, he has owned and operated a car business specializing in luxury cars, an executive limousine service, and an Amoco station. He states only the Amoco station is now in operation. Cochran was an employee of his. Mr. Taylor testified that the luxury car deals were typically arranged through a broker in Dallas, Texas named Dick McCarthy. He testified he had done business with Mr. McCarthy on a consistent basis in 1986 for many luxury car deals. No documentation was provided to corrob-

orate Mr. Taylor's testimony, and Mr. McCarthy did not appear as a witness.

Mr. Taylor testified that in October, 1986, he had been asked to locate a Cornice Rolls Royce for a Dr. Ford in Memphis. Taylor testified that he consulted with McCarthy, who forwarded a photo of a white Cornice Rolls Royce. He states McCarthy advised that the automobile was available in Miami, Florida for pickup. However, Taylor testified he did not know exactly what the purchase amount was going to be; the terms would all be coordinated somehow through McCarthy. Taylor testified that he sent Cochran to Miami to pick up the car. Taylor denied having any knowledge of how Cochran got his plane ticket and he denied knowing that Tipton was along on the trip. Taylor stated that he in fact did not tell Cochran about the money in Cochran's luggage, which he slipped into the bag when Cochran was not looking. He explained that he did not think it was appropriate for an employee to know that he was carrying such a large amount of cash. On the other hand, he stated that he intended for Cochran later to take the cash and give it to the seller in Miami; Taylor further testified, inconsistently, that his expectation was that Cochran would only drive the car, and that both the car and the cash would be driven from Miami, Florida to McCarthy in Dallas, Texas.

As stated, Cochran testified by deposition. He testified that he had been unaware of the cash in the suitcase. Cochran stated that someone else bought the plane tickets, but he could not remember who and also could not remember how he got his plane ticket. He stated someone handed it to him at the airport, but he did not know who. Cochran testified that he was going to Miami to pick up two Rolls Royces and that was the reason he had taken Tipton with him. Cochran agreed that he had had no information about who he was going to see in Miami or where he would be going to pick up the car or cars, but that he was merely to check into the hotel and await telephonic instructions.

In a forfeiture case such as this one, the initial burden is on the government to show that probable cause existed for the seizure of the funds. "Probable cause" for this purpose requires a showing that a substantial connection existed between the money seized and drug dealing. *See United States v. $41,305.00 in Currency,* 802 F.2d 1339, 1343 (11th Cir.1986). In the instant case, the government's evidence met the probable cause showing. The evidence showed that Tipton and Cochran have been drug dealers; the narcotics dog alerted to the presence of a controlled substance on the currency; Cochran and Tipton were traveling in a clandestine manner; and they were traveling to a city known to be a major drug source.

Once the government's burden had been met, the burden shifts to the claimant to show that the money had a legitimate source and was not intended for a drug transaction. *See United States v. Four Million, Two Hundred Fifty–Five Thousand Dollars,* 762 F.2d 895, 904 (11th Cir. 1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986). The standard is that of a preponderance of the evidence. *United States v. One 56–Ft. Motor Yacht Named Tahuna,* 702 F.2d 1276, 1281 (9th Cir.1983).

The court finds that the Claimants failed to meet their burden. Mr. Taylor's testimony was inconsistent in important respects and it was vague. On the one hand, Mr. Taylor testified that the money was going to be used to pay the seller in Miami; on the other hand, he stated it was going to be driven to Dallas, Texas along with the car. Even though Mr. Taylor was ostensibly the person with the largest interest in the money and the car and was the person effecting the physical arrangements for picking up the car, he was vague on the details of the purchase. He was unsure of the seller's name and claimed not to know what the exact price of the car would be.

An equally important failing of the Claimants' showing was the total failure to produce any documentation. While Mr. Taylor claimed to have been a large scale luxury car dealer, no business journals or financial documents were provided to prove this assertion. No invoices were produced

to document any car purchases, including the purchase of the car or cars allegedly at issue in this case. No documentation was provided with respect to the loans to indicate the terms thereof.

Finally, the Claimants totally failed to explain the evidence which showed that Cochran's and Tipton's trip was clandestine. The use of the false names was not explained by any witness. Cochran stated that he could not identify the individual who handed him the ticket with the false name at the airport prior to his departure. Taylor claimed to have no knowledge of the ticket purchase. Thus, the court cannot conclude that the $92,000 at issue was intended for a legitimate business transaction.

Accordingly, the Clerk is DIRECTED to enter judgment of forfeiture in favor of the United States of America.

SO ORDERED.