**UNITED STATES of America, Plaintiff,**

v.

**$83,900.00 IN UNITED STATES CURRENCY, Defendant.**

**Stephen L. Bosworth, Claimant.**

**Civ. A. No. 90–1398–T.**

United States District Court,
D. Kansas.

Sept. 17, 1991.

Michael G. Christensen, U.S. Atty's Office, Wichita, Kan., for plaintiff.

Michael R. Gibson, El Paso, Tex., for defendant and claimant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This civil forfeiture action is before the court on the defendant and claimant's motion to suppress, Doc. 11. The court held a hearing on the motion to suppress on July 12, 1991. The court has considered the testimony presented at the hearing and the post-hearing briefs and is prepared to rule.

The defendant currency and the claimant Stephen L. Bosworth (collectively "claimant") argue that certain evidence should be suppressed on the following grounds: (1) the stop of the vehicle was pretextual; (2) a partial consent was given as the result of coercion; (3) the scope of the coerced consent search was exceeded; (4) the claimant attempted to prevent a search of certain luggage, indicating a lack of consent; (5) a lack of probable cause for the seizure of the defendant currency and claimant; (6) in spite of a lack of reasonable suspicion, defendant and claimant were detained for an unreasonable period of time during which there arose no reasonable suspicion that criminal activity was afoot; (7) after seizure of the claimant's vehicle, the defen-

dant currency and the claimant, without probable cause or reasonable suspicion, a trained dog was used to conduct a sniff search.

In the claimant's brief, he requests that the following matters be suppressed: any statements by claimant, the evidence of the "alert" of the drug canine to the cash and boxes, and any personal papers seized from claimant's wallet or vehicle. In his post-hearing memorandum, the claimant requests that the amount of money, the officer's testimony about finding it, the dog's reaction to it, together with statements of the claimant after he was ordered to stand away from the car while the officer searched closed containers in the trunk and any items recovered in the search of the car or on claimant's person subsequent to the seizure of the money be suppressed.

## I. Facts

Kansas Highway Patrol Trooper Kirk E. Simone testified at the hearing. His testimony and his written report reveal the following facts. On Monday, March 12, 1990, Simone was patrolling northeast bound on Interstate 35 at approximately milepost 173.0 in Franklin County, Kansas. Simone observed a 1988 white Ford LTD Crown Victoria travelling in the southwest bound passing lane at 57 miles per hour in a 65 mile per hour zone. As the Ford passed Simone's location, Simone observed the driver perform a lane change without signalling. Simone immediately turned through the median and pursued the Ford. Simone testified that he intended to stop the vehicle and issue the driver a warning. While following the Ford around a wide right curve, Simone observed the Ford's right two tires drop off the roadway and onto the paved shoulder to a distance of about one foot. Simone stopped the vehicle at approximately milepost 171.5 at approximately 5:18 p.m.

Simone testified that he normally makes this type of stop for failure to indicate a lane change and that he would usually give the driver a warning. In this case, Simone planned to issue a warning to the driver.

Simone approached the car and informed the driver (the claimant Bosworth) of the reason for the stop. Simone asked Bosworth to produce his license and proof of insurance. Bosworth produced his driver's license but not proof of liability insurance. Bosworth stated that the car was his. Simone asked Bosworth to sit in the patrol car and left the passenger in the Bosworth vehicle.

According to Simone, Bosworth seemed overly nervous for just a written warning. In response to Simone's routine questioning, Bosworth stated that he was en route to Dallas from Kansas City, Missouri. Bosworth stated he had been in Kansas City for two days and had attended an auto action and a Big Eight basketball tournament game. Bosworth stated the vehicle was a lease vehicle, leased to Meridian Oil of Odessa, Texas, by Agency Rental. A registration check with the dispatcher revealed that the registration checked to Auto Rental, Incorporated of Maple Shade, New Jersey. Bosworth later stated that Meridian Oil leased the vehicle and that he had recently purchased the Ford from an auto auction. When asked about a large box in the back seat, Bosworth advised it contained a cooler.

While checking the VIN numbers on the Ford, Simone spoke with the passenger, Richard DeFreytas. DeFreytas stated that they were returning to El Paso, Texas from Kansas City. When asked about the trip to Dallas, DeFreytas seemed confused. DeFreytas stated in response to a question about the length of their stay in Kansas City that they had stayed in Kansas City for four or five days. When asked how the basketball game was, DeFreytas stated that he did not attend a basketball game and that he remained in his room most of the trip.

Simone returned to the patrol car and issued Bosworth a written warning for failing to signal a lane change and for failing to drive in a single lane. Simone then returned Bosworth's driver's license.

Simone was suspicious by that point and asked if Bosworth possessed any weapons, drugs, contraband or large sums of money.

Bosworth became more nervous and stated that he did not. Simone requested permission to search the vehicle for weapons, drugs, contraband or large sums of money. Bosworth stated that Simone was welcome to look in the trunk. Simone attempted to obtain a written consent to search on a Kansas Highway Patrol Consent to Search Form, but Bosworth merely stated he'd be glad to open the trunk. Simone commented that Bosworth did not want to sign anything. Bosworth stated, "Let me open the trunk, yes."

Trooper Simone retrieved the keys from the ignition and gave them to Bosworth. Bosworth opened the trunk and attempted to remove a large box which was similar to the box in the back seat. Simone advised Bosworth to stand off to the side of the vehicle. Bosworth stated, "I want you to remember, I haven't signed a consent for any of this." At no time did Bosworth ask Simone to stop looking through the trunk. Simone removed the box from the trunk and the cooler from the box. Both were empty. During the search of the trunk, Simone located a large amount of money in a tan bag. Simone advised DeFreytas to get out of the car and told both Bosworth and DeFreytas to stand to the right of the vehicle. Simone advised Bosworth and DeFreytas that they were not under arrest, but that Simone was going to seize the money until he was able to determine its legality. Simone advised both Bosworth and DeFreytas of their rights against self incrimination and questioned them about the money. Bosworth advised that the money was his, but that he did not know how much money there was. Bosworth later stated that he buys and wholesales cars, and that there was approximately $40,000 in the bag.

Simone radioed to Ottawa for assistance. While awaiting the arrival of the other officers, Simone questioned DeFreytas in the patrol car. DeFreytas provided a New Mexico drivers license. DeFreytas stated that he was a general contractor and he was not involved in Bosworth's business. DeFreytas advised that he had no previous drug arrests. Simone radioed the Osage County Sheriff's Office and requested criminal record checks on Bosworth and DeFreytas. DeFreytas had a previous drug arrest. Other officers arrived after approximately fifteen minutes.

By this point, Simone suspected that Bosworth and DeFreytas were involved in transporting and distributing drugs. Simone testified that based on his previous experience, he thought the money was drug money. He asked one of the other officers to contact the Shawnee, Kansas Police Department to send their drug canine unit. Simone testified that if the drug canine did not alert on the currency, Simone would give Bosworth his money back. Bosworth agreed to wait at that location (at the side of the highway). Shawnee Police Officer Mike Powell arrived with his dog at approximately 7:00 p.m.

Officer Powell asked Trooper Simone to remove the box from the back seat of the car. Simone testified that the dog showed a lot of interest in the box, charging at it and striking at it with his paws and snout. Simone then removed the box from view. The dog then went to the trunk and alerted on the second box located in the trunk. Simone testified that the dog almost pulled the box from the trunk with his teeth. Simone removed the box from the trunk. The dog again alerted on the trunk. The dog was placed in the trunk and alerted on the bag containing the currency which was located in the trunk.

Bosworth and DeFreytas were advised that the dog had alerted and that the currency was being seized. Bosworth was told to go to the Ottawa, Kansas Highway Patrol Office. Bosworth drove his car to the Ottawa office. DeFreytas was handcuffed and taken by Trooper Smith. Troopers Smith and Simone counted the money once and determined there to be $85,000. Simone contacted the DEA office. Simone testified that Bosworth remained free to go, although a property receipt had not yet been issued. A DEA agent arrived at the Ottawa Highway Patrol Office at approximately the same time the troopers finished counting the money.

In an interview with DEA Agent Sparks, Bosworth admitted to being arrested in El Paso in 1982 for growing marijuana. DEA Agent Sparks advised Simone to release Bosworth and DeFreytas and to seize the two large boxes which contained the large coolers and any other information that might aid in the forfeiture of the money. Bosworth was issued a receipt for $85,000, the two large boxes which contained the large coolers, and various papers seized from the car. Bosworth and DeFreytas were released. The money was secured in Simone's evidence locker overnight.

On March 13, 1990, Simone retrieved the money and went to the First National Bank in Ottawa, Kansas. Two bank employees counted the money a second and third time. The total amount of money seized was determined to be $83,900. The El Paso Police Department advised that Bosworth had two previous drug arrests, one in 1972 and the second in 1982 for possession of marijuana.

Trooper Simone testified that he issues numerous warnings for failure to signal a lane change (approximately 25 to 50 per month). He further testified that Highway Patrol policy was such that it did not make a difference whether other traffic was present when this infraction occurred. Simone further testified that he would issue a ticket for failure to use a single lane or an improper lane change if the driver was intoxicated or caused an accident or a near miss. All other times, Simone would issue a written or verbal warning. Simone testified that Bosworth never requested Simone to stop the search, although Bosworth had been told what Simone was looking for.

On cross examination, Simone admitted that could not state any details about the alleged drug activity he suspected was present. He also admitted that he did not stop and warn every driver for failure to signal a lane change. Simone testified that his curiosity was aroused by the fact that this car was travelling under the speed limit in the passing lane. When Simone observed the vehicle change lanes without signalling, Simone immediately decided to stop it. Traffic was not extremely heavy and Bosworth did not cause a near miss collision. Simone followed the Bosworth vehicle for approximately one and one half miles to catch up. He turned on his lights after Bosworth went off onto the shoulder. Bosworth immediately pulled over.

Simone testified that he considered certain facts to be indicators of illegal drug activity, including the conflicting stories given by Bosworth and DeFreytas and their return to a large drug distribution point (either El Paso or Dallas). When Simone opened the trunk, he smelled no unusual odors. Simone admitted that the presence of cash itself is not enough to suspect drugs. Since neither Bosworth nor DeFreytas admitted being involved in any drug transactions, Simone felt the need to summon a drug canine to sniff the currency. Bosworth agreed to having the dog sniff the currency. Simone testified that Bosworth could have left at any time without his money.

Simone stopped the vehicle at approximately 5:18 p.m. Simone testified that it took about ten minutes to issue the warning and fifteen minutes to conduct the initial search. Another officer called for the drug canine at approximately 6:00 p.m. The Shawnee Police drug canine unit arrived at approximately 7:00 p.m. When the Shawnee Police officer arrived, there were a total of five uniformed officers at the scene.

Simone further testified that he suspected that Bosworth had hauled drugs up to Kansas City in the large (100 quart) coolers contained within the large boxes. Receipts found in the car indicated that Bosworth had purchased the two coolers on March 9, 1990 for $79 apiece. Nothing was inside the coolers and they were dry at the time of the stop. Simone testified that the coolers were larger than the type normally seen.

Shawnee Police Officer Michael C. Powell testified regarding his training of the drug canine, Sarge. Powell testified that he was contacted at home at about 6:00 on March 12, 1990. Powell testified that due to the danger of having a dog so near the highway he had the box removed from the

rear seat of the vehicle and placed in the ditch. Sarge went immediately to the box containing the cooler and started chewing on the box. Powell testified that chewing is the dog's normal response. Sarge gave the same alert on the second box still contained in the trunk. Powell testified that Sarge bit and chewed on the box and nearly pulled the box and cooler out of the trunk. After the box was removed from the trunk, Sarge was placed in the trunk, which contained several bags. Sarge immediately alerted on the bag containing the currency. Sarge indicated on that bag three times and did not alert on anything else.

After Bosworth drove his car to Ottawa, Sarge "detailed" or sniffed the entire car. Apparently finding nothing of interest to him there, Sarge went into the Highway Patrol Office through an open door and ran off with some currency from the table where the troopers were counting. Sarge refused to let the money go until he was given his ball (his reward for performing his job). All the currency taken by Sarge was apparently recovered.

Powell testified that Sarge was never trained on currency itself. The dog is trained to alert to the odor of three drugs, marijuana, cocaine, and methamphetamine. Sarge had been used to sniff currency before. Powell testified that Sarge has over 90% accuracy in training situations.

## II. Investigative Detention—Pretext Stop

■ The stopping of a vehicle and the detention of its occupants constitute a seizure within the meaning of the fourth amendment. An ordinary traffic stop is more like an investigative detention than an arrest. Therefore, the reasonableness of traffic stops are judged under the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Walker,* 933 F.2d 812, 815 (10th Cir.1991), *reh'g denied,* 941 F.2d 1086 (10th Cir.1991).

■ Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the police may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause. *See United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The officer must be able to articulate something more than an inchoate or unparticularized suspicion or hunch. The fourth amendment requires some minimal level of objective justification for making the stop. *Id.* That level of suspicion is considerably less than proof by a preponderance of the evidence. *Id.*

An investigative detention need not be based on probable cause, only reasonable suspicion:

> An investigative detention is justified where specific and articulable facts and rational inferences from those facts give rise to reasonable suspicion that a person has committed or is committing a crime.

*United States v. Espinosa,* 782 F.2d 888, 890 (10th Cir.1986). *Terry* allows an officer to detain personal property briefly to investigate circumstances which give rise to a reasonable suspicion that the property contains narcotics. *United States v. Place,* 462 U.S. 696, 706, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). An officer's continued detention of a vehicle's occupants may be supported by reasonable suspicion following the occupants' conflicting and inconsistent responses to the officer's questions and their inability to produce the car's ownership papers. *See United States v. Rivera,* 867 F.2d 1261, 1264 (10th Cir.1989).

■ When the police lack the reasonable suspicion necessary to support a stop, but use a minor violation to support a stop in order to search for evidence of an unrelated serious crime, the stop is pretextual. *United States v. Rivera,* 867 F.2d at 1263. In *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988) the Tenth Circuit stated that:

> A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion neces-

sary to support a stop. The classic example ... occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity. *Id.* at 1515. The court held that an objective analysis of the facts and circumstances of a pretextual stop is appropriate, rather than an inquiry into the officer's subjective intent. The court adopted the test employed by the Eleventh Circuit for determining whether an investigative stop is unconstitutional: a court should ask "not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *Id.* at 1517 (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986)).

The court further stated:

That an officer theoretically *could* validly have stopped the car for a possible traffic infraction [i]s not determinative. Similarly immaterial [i]s the actual subjective intent of the deputy. [A] stop [i]s unreasonable not because the officer secretly hope[s] to find evidence of a greater offense, but because it [i]s clear that an officer would have been uninterested in pursuing the lesser offense absent that hope.

*Id.* (quoting *Smith*, 799 F.2d at 710) (emphasis and bracketed material in original). The proper focus of concern is not with why the officer deviated from the usual practice but simply that he did deviate. *Id.* A stop is not pretextual if the police routinely stop individuals who drive in the manner of the defendant. *See United States v. Rivera*, 867 F.2d at 1263–64.

The claimant argues in his motion to suppress that Trooper Simone's stop of the automobile was pretextual. The automobile was not speeding, not being driven recklessly, and not causing danger to any one. According to claimant, the pretextual nature of the stop is additionally shown by the in-depth questioning of the occupants of the vehicle regarding where they had been and what they had been doing.

The government has responded that Simone observed the vehicle change lanes without signalling and then saw the vehicle's right tires deviate onto the paved shoulder. The government argues that the claimant has failed to demonstrate that the stop was out of the ordinary.

Trooper Simone testified that he routinely stops drivers who fail to signal lane changes, regardless of the amount of traffic on the highway. The court did not find this testimony to be particularly credible. The court does not believe that a reasonable Kansas Highway Patrol Trooper would have made the decision to stop the Bosworth vehicle for failing to signal a lane change on a rural stretch of Interstate 35 with little other traffic present. The court concludes that the initial stop of the Bosworth vehicle was a pretext to question the occupants about illegal activity.

### III.  Consent Issues

A traffic stop generally ends when the officer returns the individual's license. Under controlling Tenth Circuit precedent, the encounter between Bosworth and the Trooper may have become consensual upon Simone's return of Bosworth's drivers license, notwithstanding the pretextual nature of the original stop. The Tenth Circuit has recently ruled that an investigative detention is concluded when the officer returns the driver's license and registration papers to the person who has been stopped. At that point, the encounter becomes an "ordinary consensual encounter between a private citizen and a law enforcement official." *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir.1990).

More recently, the Tenth Circuit has again discussed the distinction between investigative detentions and consensual encounters:

In *Werking*, we held that once the officer has returned the driver's license and registration in a routine traffic stop, questioning about drugs and weapons or a request for voluntary consent to search may be "an ordinary consensual encounter between a private citizen and a law enforcement official" *Id.* at 1408.   In

*Werking,* we sharply distinguished *United States v. Guzman,* 864 F.2d 1512 (10th Cir.1988), in which this Court required reasonable and articulable suspicion for such questioning. *Id.* at 1519–20. In doing so, we noted that the officer in *Guzman* had not returned the license, so the driver was not free to leave. *Werking,* 915 F.2d at 1409. Thus, if the officer retains the driver's license, he or she must have reasonable and articulable suspicion to question the driver about drugs or weapons. *Guzman,* 864 F.2d at 1519–20. However, if the officer returns the license, a driver is illegally detained only if the driver "has an objective reason to believe that he was not free to end his conversation with the law enforcement official and proceed on his way." *Werking,* 915 F.2d at 1408.
*United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991). Only an objective reason will render the encounter nonconsensual and subject to the protections of the fourth amendment. Such a coercive show of authority may consist of the presence of more than one officer, the display of a weapon, physical touching by the officer, or the officer's use of a commanding tone of voice indicating that compliance may be compelled. *Turner,* 928 F.2d at 959.

▮ A search and seizure may be made even without probable cause if voluntary consent is given. *United States v. Rivera,* 867 F.2d 1261, 1265 (10th Cir.1989). The proper test in consent search cases is not whether there was a waiver of the defendant's fourth amendment rights, but whether the consent to search was voluntary under the totality of the circumstances. *United States v. Price,* 925 F.2d 1268, 1270 (10th Cir.1991). There is no presumption against waiver of fourth amendment rights. *See id.* at 1270–71. Whether a consent to search is voluntary or was a product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances and is a matter which the government has the burden of proving. *United States v. Werking,* 915 F.2d 1404 (10th Cir.1990); *United States v. Bell,* 892 F.2d 959, 965 (10th Cir.1989), *cert. de-*

*nied,* —— U.S. ——, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). The government must show that there was no duress or coercion, express or implied. Consent must be unequivocal and specific and freely and intelligently given. *United States v. Price,* 925 F.2d at 1270.

▮ Because the initial stop was unlawful, the government bears a heavier burden in connection with the consent issue. *United States v. Recalde,* 761 F.2d 1448, 1457 (10th Cir.1985); *see United States v. Deases,* 918 F.2d 118, 122 n. 1 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2859, 115 L.Ed.2d 1026 (1991). When consent is obtained after an illegal arrest, the government must establish a break in the causal connection between the illegality and the evidence obtained. *Recalde,* 761 F.2d at 1457–58. Several factors are relevant to the determination whether evidence was obtained by exploitation of an illegal detention or whether the causal connection has been broken. These factors are: the temporal proximity of the arrest and the consent, the presence of intervening circumstances, and particularly the purpose and flagrancy of the official misconduct. *Id.* at 1458; *United States v. Walker,* 933 F.2d 812, 818 (10th Cir.1991), *reh'g denied,* 941 F.2d 1086 (10th Cir.1991).

▮ The standard for measuring the scope of a person's consent under the fourth amendment is that of objective reasonableness, i.e., what the typical reasonable person would have understood by the exchange between the officer and the subject of the search. *Florida v. Jimeno,* —— U.S. ——, 111 S.Ct. 1801, 1803–04, 114 L.Ed.2d 297 (1991). "The scope of a search is generally defined by its expressed object." *Id.* at 1804. It is objectively reasonable to conclude that a general consent to search an automobile includes consent to search any containers within that automobile which may contain the items sought. Separate consent to search containers found within the automobile need not be obtained. *Id.* The question of the scope of consent is part of the voluntariness inquiry. *United States v. Price,* 925 F.2d at 1271.

Following Simone's return of Bosworth's license, Simone asked whether Bosworth possessed any weapons, drugs, contraband or large sums of money. When Bosworth denied having any of these items, Simone asked permission to search the vehicle for weapons, drugs, contraband or large sums of money. Bosworth responded, "You're welcome to look in the trunk." Bosworth opened the trunk and attempted to assist Simone by removing the large box. Bosworth argues that as Simone continued the search, Bosworth verbally indicated that he had not consented. At this point, Simone looked into the closed bag and found the money. Bosworth had stated, "I want you to remember, I haven't signed a consent for any of this." Bosworth apparently knew he did not have to sign a consent form. However, he did nothing to stop the officer or restrict the scope of the consent that was given. He did not request Simone to cease his search of the trunk.

Following the return of Bosworth's driver's license, the encounter between Bosworth and Simone was consensual. There was no evidence presented of any coercive show of authority by Simone. At the time of the traffic stop, Simone was alone. There was no evidence that Simone displayed his weapon or touched Bosworth or DeFreytas. From the evidence presented at the hearing, the court concludes that Bosworth consented to the search. Bosworth stated more than once that Simone could look in the trunk. Bosworth assisted Simone by opening the trunk and attempting to remove the box and cooler. There was no evidence of duress or coercion on the part of Simone. Simone did not exceed the scope of the consent. Bosworth had been informed that Simone was looking for large sums of money, among other items. It was objectively reasonable for Simone to look into the closed bag contained within the trunk once consent was given to search the trunk.

The consent to search was given immediately following the pretextual traffic stop. Miranda warnings were not given before the search. Bosworth had not been told that he was free to leave, but he was free to leave under controlling Tenth Circuit precedent. There is no evidence that Simone told Bosworth that he could refuse consent to search. Bosworth was apparently aware that he had the right to refuse to consent, because he declined to sign the consent to search form. Oral consent to search is often sufficient and is sufficient in the present case. Bosworth did express oral consent to the search. The official misconduct, if it can be called that, was not flagrant. The court finds that the subsequent consent to search was sufficiently an act of free will to purge the taint of the pretextual stop.

The court will next address whether Simone's seizure of the currency was a sufficient objective reason rendering the encounter nonconsensual from that point on. An encounter with authorities that begins as a consensual encounter may turn into a detention protected by the fourth amendment. A seizure does not occur simply because a police officer stops and questions an individual. As long as a reasonable person "would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991)). The encounter does not trigger the protections of the fourth amendment unless it loses its consensual nature. *Id.* A person has been seized within the meaning of the fourth amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). The reasonable person test presupposes an innocent person. *Florida v. Bostick,* 111 S.Ct. at 2388.

The claimant argues that he was unreasonably seized when he was detained by the side of the highway for approximately two hours while assistance in the form of other troopers and a drug canine

unit were summoned. He argues that it is unreasonable to detain a citizen by the side of a highway for over two hours, by virtue of seizing his money and vehicle, for no other reason than that the citizen was in possession of legal tender of the United States.

Trooper Simone told Bosworth that he (Simone) would keep the money until its legality could be determined. Simone also stated that he would issue a receipt and provide instructions for Bosworth to retrieve the money later if it all checked out. The court must determine whether a reasonable person would feel free to leave a large amount of currency with the police and proceed on his way without it.

The seizure of the currency by Simone and Simone's expressed intention to keep the currency until its legality could be determined were objective reasons rendering the encounter nonconsensual from that point on. No reasonable person would voluntarily leave such a large sum of money with a law enforcement officer with the promise that it would be returned later if it all checked out. A reasonable person would not have felt free to leave if leaving meant turning over such a large sum of money to the police.

Since the continued detention was not consensual, the investigatory detention must be supported by reasonable suspicion of criminal activity. *United States v. Espinosa*, 782 F.2d 888, 890 (10th Cir.1986). A canine sniff is not a "search" and therefore does not need to be supported by probable cause. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). Therefore, the court is only concerned with whether reasonable suspicion supported Simone's decision to detain Bosworth and his passenger by the side of the highway to await the arrival of the drug sniffing dog.

The government argues that at the time Trooper Simone found the currency, he was aware of the following: (1) the claimant was nervous when stopped; (2) claimant became more nervous when asked if he had weapons, drugs, contraband or large sums of money; (3) claimant indicated he had no large sums of money; and (4) claimant and his passenger gave differing versions of their travels. Shortly after finding the currency, Simone became aware that DeFreytas had a previous arrest for marijuana. The government argues that when the trooper observed these factors, along with the knowledge that drug trafficking is a cash business, the totality of the circumstances provided the requisite suspicion to detain the currency for a drug sniff. The government also argues that in assessing the length of the detention, the court should take into account whether the police diligently pursued their investigation.

The presence of currency itself is not indicative of illegal activity. The packaging of the currency, however, apparently led Simone to think it was drug money. The money was contained in a small travel bag. Some of the currency was also packaged in plastic "ziplock" baggies. The cash was secured with rubber bands in bundles. Simone testified that in other cases where he has found currency after a traffic stop, it was wrapped and bundled in a similar fashion. Simone testified that in his experience, car dealers use certified checks instead of cash.

Simone also testified that Bosworth was overly nervous for an individual facing only a warning. Simone testified that Bosworth seemed fidgety and would not look at him. The Tenth Circuit has recently stated, "The general term 'nervousness' encompasses an almost infinite variety of behaviors. No doubt there are circumstances in which an individual's nervous behavior would give rise to a reasonable suspicion of criminal activity." *United States v. Walker*, 933 F.2d 812, 817 n. 3 (10th Cir.1991), *reh'g denied*, 941 F.2d 1086 (10th Cir.1991). A reasonable person would be nervous when stopped by the Highway Patrol, especially if the person had been driving within the speed limit. A certain level of nervousness is reasonable under the circumstances. Bosworth's nervousness standing alone was insufficient to create reasonable suspicion of criminal activity.

Simone testified that he had been trained in drug interdiction. He was trained to

look for certain indicators of drug activity. While no one factor is enough, several factors were present in the Bosworth stop. Bosworth and his passenger gave different stories regarding to their trip. They were returning to a large drug distribution point. Other factors Simone has been trained to look for are radar detectors, boxes of tissues, fast food wrappers, and a lack of luggage in the car. Simone did not explain the significance of certain of these factors. The court supposes that persons who are in a hurry may tend to pick up fast food "to go" and eat in the car. The court is unsure how this relates to the drug trafficking business. The court is unaware of the significance of the presence of a box of facial tissues in the vehicle. In the present case, Simone apparently saw fast food wrappers and a tissue box in the car. Simone noted the large box in the seat and wondered why it was not contained in the trunk of the car. Simone also testified that since drug dealers do not want to be caught broken down on the highway, they tend to carry certain tools and repair items in their trunks for emergencies, e.g., to fix a flat tire or replace broken belt. The Bosworth vehicle apparently contained some repair items and tools in the trunk. The trunk contained what Simone felt was a small amount of luggage—only small travel bags—for such a long trip.

At the time Simone made the decision to seize the currency, he was aware of the following matters: Bosworth was overly nervous; he possessed a large amount of currency; he previously denied possessing a large amount of currency; the currency was packaged in a manner similar other drug money previously seen by Simone; Bosworth and his passenger gave differing accounts of their trip; the vehicle contained a small amount of luggage for the trip; and the vehicle was returning to a large drug distribution point. The court concludes that based on all these facts, Simone had reasonable suspicion to detain Bosworth and the money while awaiting the arrival of the drug canine unit.

On the issue of diligence, the Shawnee, Kansas Police Department had the closest canine unit. Simone had no real choice but to wait for Officer Powell to arrive from Shawnee. The stop occurred at approximately milepost 171.5 on southbound I-35 in Franklin County, Kansas. Simone testified that Shawnee, Kansas, a suburb of Kansas City, was approximately fifty to sixty miles away. Simone was not aware of any canine unit closer to his location than the Shawnee Police canine unit.

In *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court rejected any per se rule that a 20 minute detention was too long to be justified under the *Terry* doctrine. The Supreme Court stated in *Sharpe:*

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

470 U.S. at 686–87, 105 S.Ct. at 1575–76 (citations omitted). While the detention was lengthy, the court cannot conclude that it was too long to be justified as an investigative stop, especially given the location where the stop took place.

The court next concludes, however, that the investigative detention ended

and custodial arrest occurred when Trooper Simone forced Bosworth to drive to the Ottawa Highway Patrol Office. "No bright line divides the point at which an investigatory stop becomes an unlawful detention." *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.1989) (citing *United States v. Sharp*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). "A police officer's conduct during a stop is evaluated according to whether the duration of the stop was reasonable, whether the detained person had the ability to leave or end the encounter, and whether the detained person was transported during the period of detention." *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 504–06, 103 S.Ct. 1319, 1328–29, 75 L.Ed.2d 229 (1983)).

The detention following the canine sniff lasted quite some time. Bosworth, DeFreytas, and the officers first travelled to Ottawa, Kansas, a few miles away. After travelling to Ottawa, Bosworth and his passenger waited for a DEA agent to arrive from the Kansas City area. According to the report, this was a delay of at least an hour and a half. Only after questioning by the DEA agent was Bosworth given a receipt for his property and released.

During his detention following the drug canine's sniff of the currency, Bosworth was not free to leave. Although his driver's license was returned to him, the currency was not. A number of officers were present at the side of the highway. After the dog sniffed the currency, Bosworth was told to drive his vehicle to the Ottawa Highway Patrol Office. Bosworth was informed of his rights and questioned regarding his prior criminal record, his employment and the trip to Kansas City. Bosworth was not released until the DEA agent advised Trooper Simone to release him.

Bosworth was transported to the Highway Patrol Office during the period of detention. According to Simone's report, Bosworth "was advised that he would be allowed to drive his vehicle to the Ottawa Patrol Office."

When Simone caused Bosworth to drive to the Highway Patrol Office in Otta-wa where he was detained for investigative purposes, Bosworth was arrested. *See Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). While reasonable suspicion existed to question Bosworth and subject the currency to a dog sniff, probable cause to arrest Bosworth was lacking. The government has failed to show that Bosworth consented to be taken to the Highway Patrol Office. *See United States v. Recalde*, 761 F.2d 1448, 1453–54 (10th Cir.1985).

Accordingly, the motion to suppress shall be granted, but only to a limited extent. It is not clear what, if any, statements were made by Bosworth after he arrived at the Highway Patrol Office. It is also not clear what, if any, other evidence was discovered in the vehicle or on Bosworth's person after he arrived at the Patrol Office. The court shall suppress any statements made by Bosworth after he was taken to the Highway Patrol Office and any personal papers or other tangible evidence seized from Bosworth or his vehicle after he arrived at the Highway Patrol Office. The court shall not suppress the following matters: the amount of money involved; Simone's testimony about finding the money; the testimony regarding the drug canine's reaction to the currency, boxes and coolers; any statements made by Bosworth before he went to the Patrol Office; and any personal papers or other tangible evidence seized before Bosworth went to the Patrol Office.

## IV. Probable Cause to Seize—Forfeiture Standards

The claimant makes the final argument that probable cause to seize the currency was lacking at the time it was seized. Whether probable cause to seize existed is not presently before the court. That issue awaits summary judgment motions and/or trial on the merits.

Civil forfeiture under 21 U.S.C. § 881 is an in rem action which proceeds on the legal fiction that the property itself is guilty of wrongdoing. Although a criminal conviction is not a prerequisite to civil for-

feiture, the civil forfeiture usually involves property which has been used in, or is related to, a criminal enterprise. *United States v. $152,160.00 in United States Currency*, 680 F.Supp. 354, 356 (D.Colo. 1988) (citing *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)).

In a civil forfeiture proceeding, the government bears the burden of going forward and must establish probable cause that the property was involved in criminal activity. The burden then shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture. *United States v. $39,000 in Canadian Currency*, 801 F.2d 1210, 1216–17 (10th Cir.1986). *See Boas v. Smith*, 786 F.2d 605, 609 (4th Cir.1986) (the government must establish probable cause for belief that a substantial connection exists between the property to be forfeited and the criminal activity; the burden of proof then shifts to the claimant to establish by a preponderance of the evidence that the property was not used in violation of the law or was not intended to be used unlawfully).

Probable cause for forfeiture means reasonable grounds for belief of guilt, supported by less than prima facie proof but more than mere suspicion that the property is being used for criminal activities. *United States v. $15,460.00 in United States Currency*, 741 F.Supp. 819, 820–21 (D.Or.1990). Probable cause in a forfeiture proceeding may be established by circumstantial evidence, *United States v. $38,600.00 in United States Currency*, 784 F.2d 694, 697 (5th Cir.1986), or inadmissible hearsay. *$15,460.00 in United States Currency*, 741 F.Supp. at 821; *United States v. A Parcel of Land, Buildings, Appurtenances, and Improvements, Known as 92 Buena Vista Ave.*, 738 F.Supp. 854, 857 (D.N.J.1990), *aff'd in part, remanded in part on other grounds*, 937 F.2d 98 (3d Cir.1991).

The discovery of a large amount of money, unexplained, may constitute evidence that the money was furnished or was intended to be furnished in exchange for a controlled substance. A large amount of money, combined with other circumstantial evidence such as drug paraphernalia, may be sufficient to establish probable cause for forfeiture. *$38,600.00 in United States Currency*, 784 F.2d at 697. Eighty-three thousand nine hundred dollars is a large amount of money and is more than the amount of cash commonly kept on hand by a law abiding wage earner. *See United States v. United States Currency: $24,927*, 635 F.Supp. 475, 480 (S.D.Ohio 1986); *see also United States v. $319,820.00 in United States Currency*, 620 F.Supp. 1474, 1478 (N.D.Ga. 1985) (court "[felt] confident in assuming that innocent persons do not tend to carry large amounts of cash in the manner described," i.e., small bills, banded together with rubber bands or tape instead of bank wrappers, carried in a bag and hidden on the carrier's person and in his boot). Once the government has established probable cause, the burden shifts to the claimant to show that the money had a legitimate source and was not intended for a drug transaction. *United States v. Currency Totalling $92,000.00*, 707 F.Supp. 540, 543 (N.D.Ga.1989). Even if the money came from a legitimate source such as a bank loan, the claimant must demonstrate that the money was not capital for drug purchases. *United States v. $2,355.96*, 647 F.Supp. 1460, 1463 (E.D.Mo.1986).

Standing alone, an illegal seizure does not immunize contraband from forfeiture. Any evidence which is the product of an illegal search or seizure must be excluded at the forfeiture trial. The forfeiture itself may proceed if the government can establish probable cause for forfeiture through the use of untainted evidence. *See United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 448 (9th Cir. 1983), *cert. denied sub nom. Webb v. United States*, 464 U.S. 1071, 104 S.Ct. 981, 79 L.Ed.2d 217 (1984); *United States v. $88,500*, 671 F.2d 293, 297 & n. 6 (8th Cir.1982); *A Parcel of Land, Buildings, Appurtenances, and Improvements, Known as 92 Buena Vista Ave.*, 738 F.Supp. at 856–57; *United States v. $252,671.48 in United*

*States Currency,* 734 F.Supp. 254, 257 (N.D.Tex.1990); *see also I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1039–40, 104 S.Ct. 3479, 3483–84, 82 L.Ed.2d 778 (1984).

Probable cause established after the initial seizure may be used to prove the government's right to forfeiture. *$252,671.48 in United States Currency,* 734 F.Supp. at 257; *but see United States v. All Monies in Account No. 29–0101–62,* 746 F.Supp. 1432, 1438 n. 6 (D.Hawaii 1990). Evidence to support the probable cause determination includes not only evidence obtained before the seizure of the property subject to forfeiture but also evidence obtained up until the point at which the government institutes forfeiture proceedings. *United States v. $91,960.00,* 897 F.2d 1457, 1462 (8th Cir.1990) (citing *United States v. Monkey,* 725 F.2d 1007, 1011 (5th Cir.1984)).

IT IS BY THE COURT THEREFORE ORDERED that the defendant's and claimant's motion to suppress (Doc. 11) is hereby granted in part and denied in part, as specified in this memorandum and order.